Rel: July 2, 2026

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**.  Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is printed in **Southern Reporter**.

# SUPREME COURT OF ALABAMA

## SPECIAL TERM, 2026

_____

### SC-2025-0800
_____

**Col. Alan Spencer, in his official capacity as Chairman of the Alabama Alcoholic Beverage Control Board; Melissa Morrissette, in her official capacity as a member of the Alabama Alcoholic Beverage Control Board; John Knight, in his official capacity as a member of the Alabama Alcoholic Beverage Control Board; Hal Taylor, in his official capacity as Secretary of the Alabama Law Enforcement Agency; Chris Inabinett, in his official capacity as Director of the State Bureau of Investigation; and Mary Martin Mitchell, in her official capacity as Commissioner of the Alabama Department of Revenue**

**v.**

**Vapor Technology Association and Southside Vape, LLC**

**Appeal from Montgomery Circuit Court**
**(CV-25-901284)**

_____

**SC-2025-0833**

_____

**Vapor Technology Association and Southside Vape, LLC**

**v.**

**Col. Alan Spencer, in his official capacity as Chairman of the Alabama Alcoholic Beverage Control Board; Melissa Morrissette, in her official capacity as a member of the Alabama Alcoholic Beverage Control Board; John Knight, in his official capacity as a member of the Alabama Alcoholic Beverage Control Board; Hal Taylor, in his official capacity as Secretary of the Alabama Law Enforcement Agency; Chris Inabinett, in his official capacity as Director of the State Bureau of Investigation; and Mary Martin Mitchell, in her official capacity as Commissioner of the Alabama Department of Revenue**

**Appeal from Montgomery Circuit Court**
**(CV-25-901284)**

SELLERS, Justice.

These consolidated appeals involve the constitutionality of Act No. 2025-403, Ala. Acts 2025, codified within Title 28, Chapter 11, Ala. Code 1975 ("the Alabama Act"). The Alabama Act, effective June 1, 2025, regulates the sale of electronic nicotine delivery systems ("ENDS") or e-

2

liquids, commonly referred to as "electronic cigarettes," "e-cigarettes," or "vapes."[1] In August 2025, Vapor Technology Association and Southside Vape, LLC ("the plaintiffs"),[2] commenced an action in the Montgomery Circuit Court ("the trial court") against six State defendants in their official capacities ("the State defendants"),[3] seeking a temporary restraining order ("TRO") and a preliminary injunction enjoining enforcement of the Alabama Act. The trial court entered a TRO in favor

---

[1]Section 28-11-17.2(a)(1), Ala. Code 1975, defines ENDS as "battery-powered devices that use a heating mechanism to vaporize a mixture containing nicotine or other chemicals with the intent that the vapor be inhaled."

[2]Southside Vape, LLC, is an Alabama small business that operates specialty vape shops throughout south Alabama. Vapor Technology Association is a vapor-product-industry trade association; its members include businesses in every sector of the ENDS industry, i.e., manufacturers, distributors, wholesalers, suppliers, and retailers, as well as individual consumers of ENDS.

[3]The State defendants are Col. Alan Spencer, in his official capacity as Chairman of the Alabama Alcoholic Beverage Control Board; Melissa Morrissette, in her official capacity as a member of the Alabama Alcoholic Beverage Control Board; John Knight, in his official capacity as a member of the Alabama Alcoholic Beverage Control Board; Hal Taylor, in his official capacity as Secretary of the Alabama Law Enforcement Agency; Chris Inabinett, in his official capacity as Director of the State Bureau of Investigation; and Mary Martin Mitchell, in her official capacity as Commissioner of the Alabama Department of Revenue. Mitchell was automatically substituted for former commissioner Vernon Barnett. See Rule 43(b), Ala. R. App. P.

of the plaintiffs, finding that they were likely to suffer immediate and irreparable harm if the Alabama Act was not enjoined and that their losses could not be compensated through money damages because the State defendants are entitled to State, or sovereign, immunity. On October 16, 2025, following a hearing, the trial court entered an order denying the plaintiffs' motion for a preliminary injunction. However, pursuant to Rule 62(c), Ala. R. Civ. P., the trial court extended its previously issued TRO pending the resolution of these appeals.[4] In appeal no. SC-2025-0800, the State defendants appeal from the trial court's order insofar as it enjoins certain provisions of the Alabama Act, specifically challenging the plaintiffs' standing. In appeal no. SC-2025-0833, the plaintiffs cross-appeal from the same order insofar as it denies their motion for a preliminary injunction. For the reasons stated herein, we affirm.

## I. Federal Statutory Background

---

[4]The TRO enjoined enforcement of Ala. Code 1975, §§ 28-11-7.1, 28-11-17 (enacted in 2019), 28-11-17.1(a), (b), (c), (d), (f), and (h), and 28-11.17.2.

In 2009, Congress enacted the Family Smoking Prevention and Tobacco Control Act ("the TCA"), codified at 21 U.S.C. § 387 et seq., which granted the Food and Drug Administration ("the FDA") authority to "regulate the manufacturing, marketing, sale, and distribution of tobacco products" under the Food, Drug, and Cosmetics Act ("the FDCA"), 21 U.S.C. § 301 et seq. Food & Drug Admin. v. Wages & White Lion Invs., L.L.C., 604 U.S. 542, 551 (2025). Under the TCA, a "new tobacco product" may not be marketed in interstate commerce unless the manufacturer obtains a premarket authorization from the FDA. 21 U.S.C. § 387j(a)(1)-(2). A new tobacco product is one that was "not marketed in the United States before February 15, 2007." Wages & White Lion, 604 U.S. at 551. In 2016, the FDA issued a rule deeming ENDS to be tobacco products subject to the TCA's premarket-authorization regime. 21 U.S.C. § 387j(a)(1)(A). "[B]ecause those products had not received premarket authorization, the effect of the rule was to make their continued sale illegal," and companies that "proceeded to sell their products without such authorization would be subject to stiff penalties." Wages & White Lion, 604 U.S. at 555. To give manufacturers "adequate time to apply for 'premarket' authorization, the FDA delayed enforcement for two to three

5

years." Id. Since September 2021, the FDA has made enforcement decisions regarding unauthorized ENDS on a case-by-case basis. In May 2026, while these appeals were pending, the FDA issued its final guidance, describing how the agency intends to prioritize enforcement for certain unauthorized ENDS and oral nicotine-pouch products that do not have premarket authorization. See FDA Notice, 91 Fed. Reg. 25892, 25893 (May 12, 2026) -- Enforcement Priorities for Certain New Tobacco Products Marketed Without Premarket Authorization (Guidance for Industry, Docket No. FDA-2026-D-5083, May 12, 2026) ("We made this determination because this guidance is necessary to promote transparency, and to assist FDA in efficiently allocating enforcement resources by focusing regulatory oversight on products that are more likely to meet the applicable public health standard.").

## II. The Alabama Act

Because of the delay on the part of the FDA in effectively regulating ENDS and based upon a finding that ENDS were "inherently harmful," and "highly addictive," the Alabama Act aimed to further regulate the sale of ENDS in this State. See Ala. Code 1975, § 28-11-17.2(a)(1)e. ("The FDA has largely been silent in its role as industry regulator, and has not

6

acted to remove unlawful vaping products from the shelves of retailers, nor has it acted to properly approve or disapprove vaping products for retail sale in the United States."), and § 28-11-17.2(a)(2) ("[T]he Legislature declares that the health, safety, and welfare of the residents of the State of Alabama require[] that until the FDA begins to effectively regulate vaping products in the United States, this state must restrict and prohibit the sale of foreign vaping products.").

The plaintiffs challenge § 28-11-17, Ala. Code 1975, enacted before the Alabama Act in 2019, which makes it a class C misdemeanor to "distribute, sell, or offer for sale any [ENDS] or alternative nicotine products that cannot be legally marketed under federal law or FDA rule, regulation, or guidance." They also challenge certain subsections of § 28-11-17.1, Ala. Code 1975, that, in relevant part, regulate the sale of ENDS by establishing an ENDS Product Directory ("the Directory"), which is an online list of approved products that can be legally sold in the state. Section 28-11-17.1 is composed of three parts. The first part, concerning certification requirements, provides, in relevant part, that, beginning October 1, 2025, "every e-liquid manufacturer and manufacturer of alternative nicotine products whose products are sold in

7

this state" must submit to the Alabama Department of Revenue a certification that its product is compliant with federal law. § 28-11-17.1(a)(1). The second part of the statute primarily sets forth the revenue commissioner's duties regarding the Directory and establishes set fees associated with offsetting the costs of processing certifications and operating the Directory. The third part, concerning violations and penalties, establishes severe financial and administrative penalties for businesses that stock or sell ENDS products not listed on the Directory. Finally, the plaintiffs challenge § 28-11-17.2(b), which, in relevant part, provides that, beginning October 1, 2025, "no e-liquid, [ENDS], or alternative nicotine product may be added to the [ENDS] Directory maintained by the Department of Revenue pursuant to Section 28-11-17.1," unless either of the following apply: "(1) [t]he product and its components are made, packaged, labeled, and manufactured in the United States" or "(2) [t]he manufacturer of the product has received a marketing order or other authorization under 21 U.S.C. § 387j(c)(1)(A)(i) authorizing the product to be introduced or delivered for introduction into interstate commerce."

### III.  Appeal No. SC-2025-0800 -- Standing

8

We first address the State defendants' argument that the plaintiffs lack standing to challenge the Alabama Act on constitutional grounds. To establish standing, a plaintiff must demonstrate (1) an injury in fact, (2) causation, and (3) redressability. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992). An injury in fact requires the invasion of a legally cognizable interest that is concrete, particularized, and actual or imminent, and not conjectural or hypothetical. Id. The plaintiffs have easily satisfied the injury-in-fact prong because, as the trial court properly concluded, enforcement of the Alabama Act will cause them to suffer lost profits, lost employees, and the potential closing of their businesses. In addition, the Alabama Act further provides that the sale of ENDS not listed on the Directory are prohibited and that businesses that sell or stock prohibited ENDS may be punished with stiff penalties and fines, including having their products declared as contraband and seized by law enforcement. See § 28-11-17.1. These types of injuries readily qualify as concrete injuries. See TransUnion LLC v. Ramirez, 594 U.S. 413, 425 (2021) (noting that tangible harms such as monetary harms readily qualify as concrete injuries), and Alabama Alcoholic Beverage Control Bd. v. Henri-Duval Winery, L.L.C., 890 So. 2d 70, 75

9

(Ala. 2003) (holding that a plaintiff had standing to challenge an act's constitutionality when the act negatively impacted him and his business). Next, the plaintiffs' asserted injuries are not hypothetical; rather, they flow directly from enforcement of the Alabama Act; thus, the causation prong is also satisfied. Finally, redressability "depends on the relief requested, not the relief to which a plaintiff can prove it is entitled on the merits." Wisconsinites for Alternatives to Smoking & Tobacco, Inc. v. Casey, 172 F.4th 976, 983 (7th Cir. 2026). If the Alabama Act is found unconstitutional, as the plaintiffs allege, then their injuries would be remedied because they could continue to sell their products without interference by the State defendants and the fear of reprisal. See id. ("A decision for Wisconsinites would provide a remedy because they could sell and access ENDS products without fear of adverse action. Because the alleged harms would flow directly from enforcing [the Wisconsin Act], and are redressable by the requested relief, Wisconsinites have alleged and established a concrete harm sufficient for Article III standing.").

Based on the foregoing, we conclude that the plaintiffs have standing to challenge the constitutionality of Alabama Act.[5] Lujan.

IV.  Appeal No. SC-2025-0833 -- Preliminary Injunction

The plaintiffs argue that the trial court erred in denying their motion for a preliminary injunction.

> "A party seeking a preliminary injunction must demonstrate (1) that the party would suffer irreparable harm without the injunction, (2) that the party has no adequate remedy at law, (3) that the party has at least a reasonable chance of success on the ultimate merits of the case, and (4) that the hardship that the injunction will impose on the opposing party will not unreasonably outweigh the benefit accruing to the party seeking the injunction. Holiday Isle,

---

[5]We reject the State defendants' argument that the plaintiffs lack standing because, they say, the plaintiffs' conduct will remain illegal regardless of the outcome of this case.  Although the plaintiffs may be violating the Alabama Act by selling illegal ENDS, their standing stems from an injury that will result from the enforcement of the Alabama Act, not the illegality of present or past sales.  See Wisconsinites for Alternatives to Smoking & Tobacco, Inc. v. Casey, 172 F.4th 976, 982 (7th Cir. 2026) (rejecting the Department of Revenue's argument that the plaintiffs lacked standing because "their conduct would be illegal, regardless of this case's outcome"), and Iowans for Alternatives to Smoking & Tobacco, Inc. v. Iowa Dep't of Revenue, 781 F. Supp. 3d 724, 734 (S.D. Iowa 2025) ("The appropriate inquiry focuses not on whether Plaintiffs' activities fully comply with federal law, but on whether they have alleged a concrete injury that could be redressed by a favorable decision," and "[a] rule that denies standing to Plaintiffs based solely on imperfect compliance with federal law would create an anomalous result: states could evade preemption challenges by simply asserting a plaintiff's noncompliance with the very federal standards at issue.  Such circularity finds no support in our federalist structure.").

LLC v. Adkins, 12 So. 3d 1173, 1176 (Ala. 2008). Generally, '"[t]he decision to grant or to deny a preliminary injunction is within the trial court's sound discretion. In reviewing an order granting [or denying] a preliminary injunction, the Court determines whether the trial court exceeded that discretion."' Holiday Isle, 12 So. 3d at 1175-76 (quoting SouthTrust Bank of Alabama, N.A. v. Webb-Stiles Co., 931 So. 2d 706, 709 (Ala. 2005)). We review the legal rulings of the trial court, to the extent they resolve questions of law based on undisputed facts, de novo. Id. at 1176."

Bethel v. Franklin, 381 So. 3d 1121, 1126 (Ala. 2023).

The trial court concluded that the plaintiffs will suffer irreparable harm without an injunction based on the economic harm they will incur if the Alabama Act is enforced. The trial court further found that the plaintiffs have no adequate remedy at law because their injuries cannot be remedied through an award of money damages, specifically because the State defendants would be entitled to State, or sovereign, immunity. Thus, the trial court presumably denied the injunction on the basis that the plaintiffs do not have a reasonable chance of success on the ultimate merits of their constitutional arguments. We, therefore, address the merits of their constitutional arguments.

## A. Implied Preemption

The Supremacy Clause of the United States Constitution establishes that the Constitution, federal laws, and treaties constitute

the "the supreme Law of the Land." U.S. Const., Art. VI, cl. 2. The clause provides Congress the power to preempt state law. Where, as here, implied preemption is alleged, we must determine whether compliance with both state and federal law is impossible, specifically asking whether "the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress." Silkwood v. Kerr-McGee Corp., 464 U.S. 238, 248 (1984). If the state law would "prevent or frustrate" federal objectives, it is "nullified" by the Supremacy Clause. Geier v. American Honda Motor Co., 529 U.S. 861, 873 (2000). Here, the plaintiffs contend that the Alabama Act is impliedly preempted by 21 U.S.C. § 337(a) of the FDCA, which provides that all proceedings to enforce or restrain violations of the FDCA "shall be by and in the name of the United States." See Buckman Co. v. Plaintiff's Legal Comm., 531 U.S. 341, 352 (2001) (noting that § 337(a) is "clear evidence that Congress intended that the [Medical Device Amendment] be enforced exclusively by the Federal Government"). The plaintiffs argue that the Alabama Act is impliedly preempted by § 337(a) because, they say, under the Alabama Act, the State must decide whether an ENDS has a marketing order under the FDA or falls under the FDA's deferred-enforcement policy and, if not,

13

whether and when to seek civil or criminal penalties against the purported offenders. According to the plaintiffs, this enforcement regime effectively transfers the FDA's complete enforcement discretion under § 337(a) to the State and allows the State defendants to make enforcement decisions that only the FDA can make.

Because the plaintiffs' claims implicate tobacco regulation, an area that the States have traditionally occupied, this Court starts with the "'assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'" New York State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co., 514 U.S. 645, 655 (1995) (quoting Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230 (1947)). The plaintiffs rely heavily on the language of § 337(a) providing that all proceedings to enforce or restrain violations of the FDCA "shall be by and in the name of the United States." See Buckman, supra. However, in 2009, when Congress amended the FDCA through the TCA, it expressly sought to address the legality of state regulation of tobacco products through a carefully balanced preemption scheme consisting of a preservation

14

clause, a preemption clause, and a savings clause.  See 21 U.S.C. § 387p.

The preservation clause provides, in relevant part:

> "Except as provided in paragraph (2)(A), nothing in [the TCA] … shall be construed to limit the authority of a … State … to enact, adopt, promulgate, and enforce any law, rule, regulation, or other measure with respect to tobacco products that is in addition to, or more stringent than, requirements established under [the TCA] … relating to or prohibiting the sale, distribution, possession, exposure to, access to, advertising and promotion of, or use of tobacco products by individuals of any age, [or] information reporting to the State …."

21 U.S.C. § 387p(a)(1) (emphasis added).

The preemption clause, in turn, provides, in relevant part:

> "No State … may establish or continue in effect with respect to a tobacco product any requirement which is different from, or in addition to, any requirement under the provisions of [the TCA] relating to tobacco product standards, premarket review, adulteration, misbranding, labeling, registration, good manufacturing standards, or modified risk tobacco products."

21 U.S.C. § 387p(a)(2)(A) (emphasis added).

Finally, the savings clause, which is an exception to the preemption clause, provides, in relevant part:

> "Subparagraph (A) does not apply to requirements relating to the sale, distribution, possession, information reporting to the State, exposure to, access to, the advertising and promotion of, or use of, tobacco products by individuals of

any age, or relating to fire safety standards for tobacco products."

21 U.S.C. § 387p(a)(2)(B) (emphasis added).

In summary, the preservation clause reserves power in the States to regulate the sale, distribution, possession, or use of tobacco products more stringently than those products are regulated under the federal requirements. It is under the preservation clause that states retain broad power to regulate, and even ban, the sale of tobacco products. See R.J. Reynolds Tobacco Co. v. County of Los Angeles, 29 F.4th 542, 560 (9th Cir. 2022). The preemption clause, in turn, carves out eight categories that are preempted, none of which apply to the sale of tobacco products. Finally, the savings clause protects the regulation of tobacco "sale[s]" and "distribution" from preemption. Thus, like other courts, we conclude that the inclusion of the preservation and savings clauses in § 387p was an intentional choice on the part of Congress to preserve for the states their traditional role relating to the regulation, sale, and distribution of tobacco products.[6] See Wisconsinites, 172 F. 4th at 986

---

[6]While we recognize that some courts have applied the principles in Buckman Co. v. Plaintiffs' Legal Committee, 531 U.S. 341 (2001), to hold that state claims incorporating the FDCA are preempted, we find that case distinguishable. In Buckman, the United States Supreme Court

16

("[T]he TCA creates a tripartite preemption structure," and "[t]he preservation clause's text shows Congress's decision to reserve the states' power to regulate tobacco 'in addition to, or more stringent than' the [TCA's] requirements '[e]xcept as provided in [the preemption clause].' 21 U.S.C. § 387p(a)(1)."); R.J. Reynolds Tobacco Co. v. City of Edina, 60 F.4th 1170, 1178 (8th Cir. 2023) ("Although the TCA does grant the FDA exclusive authority to promulgate tobacco manufacturing standards, Section 387p can be plausibly interpreted as preserving state laws that relate to manufacturing, so long as they also relate to the sale of tobacco."); R.J. Reynolds Tobacco Co. v. County of Los Angeles, 29 F.4th at 555 ("In short, the TCA's text sandwiches limited production and marketing categories of preemption between clauses broadly preserving and saving local authority, including any 'requirements relating to the sale' of tobacco products. This unique 'preservation sandwich' enveloping the TCA's preemption clause reveals a careful balance of power between federal authority and state, local, and tribal authority, whereby Congress

---

considered whether state-law claims of fraud on the FDA conflicted with the FDA's responsibility to police fraud. Thus, Buckman did not involve tobacco regulation, an area traditionally reserved for the states; nor was there any analysis in that case regarding the effect of the preservation and savings clauses of § 387p.

17

has allowed the federal government to set the standards regarding how a product would be manufactured and marketed, but has left states, localities, and tribal entities the ability to restrict or opt out of that market altogether."); and <u>U.S. Smokeless Tobacco Mfg. Co. v. City of New York</u>, 708 F.3d 428, 436 (2d Cir. 2013) ("[G]iven Congress's explicit decision to preserve for the states a robust role in regulating, and even banning, sales of tobacco products, we adopt a broad reading of the saving clause and a limited view of the kinds of restrictions that would constitute a ban and require us to address the permissibility of outright prohibitions under the saving clause.").  As noted in <u>Wisconsinites</u>, a state law "that mirrors a federal standard does not create a conflict; rather they impose the same standards," and there is no implied preemption "if there is no conflict."  172 F.4th at 988.  Based on the foregoing, we conclude that the plaintiffs have failed to demonstrate a reasonable likelihood of success on the merits of their implied-preemption claim.

## B.  Dormant Commerce Clause

The Commerce Clause grants Congress the power "[t]o regulate Commerce with foreign Nations, and among the several States, and with

Indian Tribes." U.S. Const., Art. I, § 8, cl. 3. The Commerce Clause includes not only an affirmative authorization for Congress to regulate interstate commerce, but also a corresponding restraint on the power of state governments or municipalities to regulate that commerce. Campus Crest at Tuscaloosa LLC v. City of Tuscaloosa, [SC-2025-0020, Oct. 3, 2025] ___ So. 3d ___ (Ala. 2025). That restraint is referred to as the dormant Commerce Clause. Id. The plaintiffs argue that § 28-11-17.2(b)(1) and (2) of the Alabama Act facially discriminates against foreign commerce. Those subsections restrict the addition of any foreign-made products to the Directory unless "(1) [t]he product and its components are made, packaged, labeled, and manufactured in the United States" or "(2) [t]he manufacturer of the product has received a marketing order or other authorization under 21 U.S.C. § 387j(c)(1)(A)(i) authorizing the product to be introduced or delivered for introduction into interstate commerce." The regulation of foreign commerce is typically the province of the federal government and not of the several states; however, when an act facially discriminates against foreign commerce, states are permitted to discriminate only if they have a legitimate, and not pretextual, reason to justify, and can proffer a rationale for, such

19

discrimination. See Maine v. Taylor, 477 U.S. 131, 140 (1986) (A statute that facially discriminates against foreign commerce can be overcome only by a showing that the statute serves a "legitimate local purpose, and the purpose must be one that cannot be served as well by available nondiscriminatory means."). See also Fort Gratiot Sanitary Landfill, Inc. v. Michigan Dep't of Nat. Res., 504 U.S. 353, 366 (1992) (recognizing, for Commerce Clause purposes, the "difference between economic protectionism, on the one hand, and health and safety regulation, on the other"). In Maine, the United States Supreme Court examined a Maine statute that restricted interstate trade in the "most direct manner possible, blocking all inward shipments of live baitfish at the State's border." 477 U.S. at 137. As the Supreme Court explained:

> "It is well established that Congress may authorize the States to engage in regulation that the Commerce Clause would otherwise forbid. See, e.g., Southern Pacific Co. v. Arizona ex rel. Sullivan, 325 U.S. 761, 769 (1945). But because of the important role the Commerce Clause plays in protecting the free flow of interstate trade, this Court has exempted state statutes from the implied limitations of the Clause only when the congressional direction to do so has been 'unmistakably clear.' South-Central Timber Development, Inc. v. Wunnicke, 467 U.S. 82, 91 (1984). …"

---

"The Commerce Clause significantly limits the ability of States and localities to regulate or otherwise burden the flow of interstate commerce, but it does not elevate free trade above all other values. As long as a State does not needlessly obstruct interstate trade or attempt to 'place itself in a position of economic isolation,' Baldwin v. G.A.F. Seelig, Inc., 294 U.S. 511, 527 (1935), it retains broad regulatory authority to protect the health and safety of its citizens and the integrity of its natural resources. The evidence in this case amply supports the District Court's findings that Maine's ban on the importation of live baitfish serves legitimate local purposes that could not adequately be served by available nondiscriminatory alternatives. This is not a case of arbitrary discrimination against interstate commerce; the record suggests that Maine has legitimate reasons, 'apart from their origin, to treat [out-of-state baitfish] differently,' Philadelphia v. New Jersey, 437 U.S. [617,] 627 [(1978)]."

Id. at 138-39 and 151-52.

Likewise, here, even though the Alabama Act clearly discriminates against foreign trade, the State defendants have offered a compelling reason to substantiate that the Alabama Act's restriction serves a legitimate state purpose aimed directly at protecting the health and safety of the citizens of this State and is not a measure to protect, benefit, or favor the State's economy at the expense of international or interstate trade. Specifically, the declarations of the Legislature regarding the prohibition on the sale of foreign products make clear that the prohibition is not arbitrarily discriminatory or a pretextual obstruction to favor

21

Alabama businesses. Rather, the prohibition serves a legitimate local purpose related to the health and safety of this State's citizens, including its youth, which cannot be served by available nondiscriminatory alternatives. Section 25-11-17.2, regarding the restriction on the sale of foreign-made ENDS, provides, in pertinent part:

"(a)(1) The Legislature finds and declares the following:

"a. [ENDS], commonly called electronic cigarettes or e-cigarettes, or simply 'vapes,' are battery-powered devices that use a heating mechanism to vaporize a mixture containing nicotine or other chemicals with the intent that the vapor be inhaled.

"b. E-cigarettes are inherently harmful. The main ingredient, nicotine, is highly addictive, and the amounts of nicotine are largely unregulated. A single e-cigarette can have as much nicotine as hundreds of traditional cigarettes. Scientific studies have shown that the most commonly used organic solvent of e-cigarette oil, propylene glycol, has been shown to form carcinogens including formaldehyde when oxidized. The components of e-cigarettes contain varying amounts of carcinogenic metals, the most common of which are chromium, nickel, and aluminum which, when heated, can be released into the device and enter the user's body.

"c. E-liquids manufactured in foreign countries are notorious for being manufactured with pesticide-grade nicotine, industrial propylene glycol, and other highly harmful chemicals to the human body. There have been numerous reports of

22

> these foreign products being fraudulently labeled to bypass customs enforcement and regulators.
>
> "d. There are thousands of different types of e-cigarettes and varying e-liquids sold in the United States today, but only an extremely small fraction of this amount has actually received approval from the federal [FDA].
>
> "e. The FDA has largely been silent in its role as industry regulator, and has not acted to remove unlawful vaping products from the shelves of retailers, nor has it acted to properly approve or disapprove vaping products for retail sale in the United States.
>
> "(2) Based on the foregoing, the Legislature declares that the health, safety, and welfare of the residents of the State of Alabama requires that until the FDA begins to effectively regulate vaping products in the United States, this state must restrict and prohibit the sale of foreign vaping products."

(Emphasis added.)

This case is a prime example of a State's retention of authority under its general police powers to regulate a matter of legitimate state-wide concern, specifically the health and welfare of its citizens. Thus, the Legislature in this case has not overstepped its role in regulating foreign commerce; rather, it has declared a legitimate interest to protect the State's citizens by regulating a potentially harmful product and by restricting its sale and distribution. Accordingly, we conclude that the

23

plaintiffs have failed to demonstrate a reasonable likelihood of success on the merits of their dormant Commerce Clause claim.

## V. Conclusion

The State defendants have failed to demonstrate that the plaintiffs lacked standing. Nevertheless, the plaintiffs have failed to demonstrate a reasonable likelihood of success on the merits of their constitutional claims; thus, they have also failed to demonstrate that the balance of harms and public interest weigh in favor of enjoining enforcement of the Alabama Act. Bethel, supra. Accordingly, the order of trial court denying the plaintiffs' motion for a preliminary injunction is affirmed.[7]

SC-2025-0800 -- AFFIRMED.

Stewart, C.J., and Wise, Bryan, Mendheim, and McCool, JJ., concur.

Cook, J., concurs in part and concurs in the result, with opinion.

Shaw, J., concurs in the result.

Parker, J., recuses himself.

---

[7]Because our resolution of the plaintiffs' appeal favors the State defendants, we pretermit discussion of their argument relating to the trial court's alleged violation of Rule 65(c), Ala. R. Civ. P.

24

SC-2025-0833 -- AFFIRMED.

Stewart, C.J., and Wise, Bryan, Mendheim, and McCool, JJ., concur.

Cook, J., concurs in part and concurs in the result, with opinion.

Shaw, J., concurs in the result.

Parker, J., recuses himself.

COOK, Justice (concurring in part and concurring in the result).

I concur in the main opinion's preemption analysis which resolves this appeal. However, I write separately to address the standing requirement, which I believe presents a much closer question.

The facts here are unusual. The plaintiffs challenge only the state law regulating the sale of ENDS while <u>leaving unchallenged the federal law</u> that the state law substantively incorporates. Indeed, as noted below, one of the plaintiffs here has affirmatively acknowledged in other federal litigation that federal law prohibits it from selling the products it seeks to sell.

Can a plaintiff challenge a state law on federal-preemption grounds when the same plaintiff admits that federal law independently forbids the conduct at issue? The answer is not obvious. Although I ultimately conclude that the answer is probably yes under these particular facts, I diverge from the main opinion's analysis for reaching this conclusion. For that reason, I concur in the result with that part of the decision.

<u>Federal Courts Have Reached Opposite Conclusions on this Question</u>

I first note that federal courts across the country have begun confronting this question in similar cases. However, their standing

analyses have not been uniform.

On one side are federal courts in Iowa and Wisconsin, which have held that challengers have standing to pursue such preemption claims. In Wisconsinites for Alternatives to Smoking & Tobacco, Inc. v. Casey, Case no. 25-cv-552-wmc, Sept. 5, 2025) (W.D. Wis. 2025) (not reported in the Federal Supplement), aff'd, 172 F.4th 976 (7th Cir. 2026), the federal district court found that the "plaintiffs have a legitimate basis for believing that the FDA will continue its practice of allowing the ENDS market to grow[]" and that, "under the FDA's current practice, plaintiffs arguably are engaged in legal economic activities." Id. Those conclusions were sufficient to establish standing.

Likewise, a federal district court in Iowa concluded that the state's "legally protected interest" theory was "describing the need for a 'judicially cognizable interest,' not imposing a requirement that a plaintiff's conduct comply with all aspects of federal law." Iowans for Alternatives to Smoking & Tobacco, Inc. v. Iowa Dep't of Revenue, 781 F. Supp. 3d 724, 734 (S.D. Iowa 2025). As a result, the federal district court concluded that standing was established in that case.

However, other courts have reached the opposite conclusion. For

example, in Mississippi, Vapor Technology Association -- one of the plaintiffs now before us -- "concede[d] that the sale of ENDS products [is] illegal under federal law." Vapor Tech. Ass'n v. Graham, CIVIL ACTION NO. 1:25-cv-336-LG-BWR, Dec. 15, 2025) (S.D. Miss. 2025) (not reported in the Federal Supplement). The federal district court there concluded that enforcement of the state law "is an impediment to Plaintiffs' efforts to continue to market and sell products that are illegal under federal law." Id. It therefore determined that "there is no legally protected interest to commit a crime." Id. In support of that conclusion, the court relied on a Fifth Circuit Court of Appeals' decision reasoning that "'[i]nterest in evading the law cannot create standing -- a plaintiff's complaint that the defendant's actions will make his criminal activity more difficult lacks standing because his interest is not legally protected.'" Id. (quoting Bell v. Redflex Traffic Sys., Inc., 374 F. App'x 518, 520 (5th Cir. 2010)).

A federal district court in Kentucky agreed. It reasoned that "[t]he selling of [ENDS] is, by the plain language of [the federal regulation], unlawful conduct." Vapor Tech. Ass'n v. Taylor, CASE NO. 3:24-CV-74-KKC, Jan. 30, 2025 (E.D. Ky. 2025) (footnote omitted) (not reported in

28

the Federal Supplement). The federal district court also noted that plaintiffs' counsel had conceded that "'technically these [vapor] products do not comply with the FDCA.'" Ultimately, the federal district court concluded: "Put simply: they are illegal products" and "'[t]his interest in evading the law cannot create standing[.]'" Id. (quoting Initiative & Referendum Inst. v. Walker, 450 F.3d 1082, 1093 (10th Cir. 2006)). It then summarized its reasoning by quoting a well-respected treatise:

> "A leading civil procedure treatise summarizes this issue well: 'Standing would not be recognized for a smuggler who asserted that his drug traffic was disrupted. Although the smuggler had been injured in fact, and the inspection procedures might indeed be unlawful, the asserted interest is not one the courts will protect.' 13A C. Wright, A. Miller, & E. Cooper, Fed. Prac. & Proc. Juris. § 3531.4 (3d ed. 2023) (footnote omitted)."

Id. (emphasis added).[8]

### Why There Is Likely Standing In These Cases

As illustrated by the cases discussed above, standing is a close question under federal law. Our decision on standing is a question of Alabama law, but our caselaw has referenced federal law in determining

---

[8]In the present case, the State defendants also rely on a similar case from our Court, State v. Epic Tech, LLC, 378 So. 3d 467, 486 (Ala. 2022), in which our Court held that "[t]he defendants have no right to engage in, and, thus, cannot be harmed by being enjoined from continuing in, an illegal enterprise." (Emphasis omitted.)

standing. See Hanes v. Merrill, 384 So. 3d 616, 622-23 (Ala. 2023)(Cook, J., concurring specially) (explaining that standing for cases in Alabama courts is based upon the Alabama Constitution but noting that Alabama caselaw has applied Lujan v. Defenders of Wildlife, 504 U.S. 555 (1992), and also emphasizing that our Court should examine the requirements of standing anew rather than simply adopt the federal standard); and Ex parte BAC Home Loans Servicing, LP, 159 So. 3d 31 (Ala. 2013) (recognizing that, in Alabama, standing is a consideration in "public-law" cases). Under these particular facts, I agree that standing likely exists here for a few reasons.

First, the plaintiffs presumably could raise this same preemption argument if the State initiated an enforcement action against them. And it appears undisputed that such an enforcement action is substantially certain to occur if the plaintiffs make sales of their products in Alabama. Thus, I see little reason to deny the parties the opportunity to resolve the issue through a preenforcement challenge.

Second, there may be a meaningful distinction between criminal prohibitions and civil regulatory schemes. The cases denying standing emphasize that no one has a legally protected interest in violating the

law, specifically noting <u>criminal</u> laws (for instance, the drug-smuggling example referenced in <u>Vapor Tech. Ass'n v. Taylor</u>, <u>supra</u>). But the federal scheme at issue here primarily imposes civil penalties. Criminal enforcement appears to be exceedingly rare, and it is not clear whether it may require additional elements. These distinctions may matter. Perhaps a plaintiff cannot establish standing to complain about state action when the plaintiff's actions are a violation of a federal law with criminal sanctions, yet the plaintiff may still possess a sufficient interest when the relevant federal restrictions are enforced exclusively through civil mechanisms. I do not need to decide that question today, and I express no definitive view on it.

Third, it appears the federal government has intentionally delayed any enforcement, and it is less than clear when future enforcement action will occur at the federal level.

In sum, while I am willing to agree that the plaintiffs have standing in these particular cases, I am reluctant to agree that the question of standing to challenge a state law when the conduct is already prohibited by a federal law is settled for future cases that might involve different facts.